IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

IN RE: LIVING HOPE SOUTHWEST                     No. 4:06-bk-71484
       MEDICAL SVCS, LLC,                             (CHAPTER 7)
                        Debtor.

RENEE S. WILLIAMS, TRUSTEE                     PLAINTIFF

VS.                                                   AP No. 4:09-ap-7026

PILLAR CAPITAL HOLDINGS, LLC                   DEFENDANTS
and JACK GOLDENBERG

<u>MEMORANDUM OPINION</u>

       Renee S. Williams, the trustee in this Chapter 7 bankruptcy case, filed a complaint and

two subsequent amended complaints against creditor Pillar Capital Holdings, LLC (Pillar) and

its president, Jack Goldenberg.  Pursuant to Section 549 of the United States Bankruptcy Code,

the Trustee  seeks to avoid certain unauthorized post-petition transfers from Living Hope

Southwest Medical Services (Debtor) to the two defendants while the Debtor operated as a

debtor-in-possession under Chapter 11.

        The Defendants responded with an answer and counterclaim that Pillar extended post-

petition loans to the Debtor to preserve the estate and is thus entitled to an administrative

expense for the loans and also  for payments to third parties  to benefit the Debtor.   The

Defendants also counterclaimed  for turnover of certain equipment valued at $38,734.77, which

Pillar contends it purchased and provided to the Debtor as an accommodation.

       After hearings on June 8 and June 29, 2010, in Texarkana and Little Rock, Arkansas, the

Trustee and the Defendants requested by verbal motion that  the Court  conform the pleadings  to

1

the proof introduced at the trial. (Tr. at 120.) The Court granted the motions and subsequently

took the matter under advisement.

This matter is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2) (A) &(O) (2006), and

the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the

Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy

Procedure 7052.

FACTS

The Debtor filed for relief under the provisions of Chapter 11 of the Bankruptcy Code on

July 18, 2006, and the case was converted to Chapter 7 on August 15, 2008. The events relevant

to the issues in this case occurred during the period from November 2007 through May 2008

while the Debtor was still operating as a Debtor in Possession. During the Debtor's Chapter 11

phase, no plan of reorganization was ever confirmed.

During the relevant period, the Debtor provided inpatient psychiatric services at a 62-

bed hospital in Texarkana, Arkansas, and outpatient services at various other locations in

southern Arkansas. (Tr. at 84-85.) Kimbro and Alice Stephens principally owned the Debtor,

and Jimmy Peabody served as comptroller of the Debtor.

Northern Healthcare Capital (NHC) provided financing for the Debtor under a revolving

line of credit and term loan that were secured by real estate and other assets of the Debtor. The

Debtor's total indebtedness to NHC , which was approximately $3,250,000.00, was personally

guaranteed by the Stephens. (Pl.'s Ex. 22-B.) The Debtor operated pursuant to an agreement

under which all the Debtor's collections were required to be deposited in a lockbox account to be

swept daily by NHC.

In the latter part of 2007, Aaron Brand, a managing member of NHC, contacted Goldenberg about the possibility of acquiring an interest in the Debtor. Goldenberg is president and sole member of Pillar Capital, a limited liability company incorporated in New York that invests in bankrupt or financially distressed businesses. (Tr. at 10-11, 112-13, 117.)  After an investigative trip to Texarkana in November 2007, Goldenberg commenced negotiations with Stephens and NHC to purchase an interest in the Debtor.

NHC wrote a March 12, 2008 letter to Kimbro Stephens and Goldenberg outlining the terms under which NHC would agree to modify its financing arrangement with the Debtor in connection with the Debtor's contemplated reorganization plan. (Pl.'s Ex. 22-B.) The letter stated that all proposed terms were contingent on confirmation by NHC's credit committee, that the letter was not a binding commitment by NHC to provide the proposed financing, and that the letter's provisions could be superceded by subsequent "definitive documents." (Pl.'s Ex. 22B.)

The letter further provided that Goldenberg would have the option to be admitted as an equal 50% member of Living Hope "at any time from the execution of definitive documents implementing the terms set forth in this Term Sheet until May 15, 2008.  Commencing immediately upon the execution of definitive documents, Goldenberg will provide Living Hope a minimum of $250,000 line of credit which will be subordinated" to the amounts owed to NHC. (Pl.'s Ex. 22-B.)  Goldenberg could be repaid for any extensions of credit from the Debtor's available funds after the Debtor made required payments to NHC.   Upon signing the letter agreement, Goldenberg was required to provide NHC with a $25,000 non-refundable, good faith deposit.

NHC's letter contained signature lines for Goldenberg, Kimbro Stephens, and a principal

of NHC.  The letter concluded by stating that the proposal would expire on March 12, 2008 if

not signed by that date.  The copy of the document admitted into evidence was  signed only by

Kimbro Stephens.  However, Goldenberg paid NHC $25,000.00 by a check written on the

account of National Mutual Inc.,  dated March 12, 2008, and signed by Goldenberg.  The check

bore the notation "Living Hope" in the memorandum line. (Pl.'s Ex. 22-C.)  Goldenberg testified

that, although the letter agreement was never finalized,  he paid the money  to NHC because of

the  provision in the letter that required it.  (Tr. at 111-112.)

      Despite the absence of a documented  binding agreement with NHC and the Stephens,

Goldenberg not only paid the fee to NHC but also  proceeded to behave as if his option to invest

in the Debtor remained  viable.  Goldenberg stated that NHC "had agreed to give me a due

diligence period for two months. . . .  I had an option to purchase an interest in the debtor post-

due diligence if I was happy with what I saw." (Tr. at 13.)

      During this two-month period, Goldenberg made several  trips to the Debtor's location in

Texarkana that he stated were aimed at  conducting  "due diligence" to determine if he would

eventually  become an investor in the company.  At the same time,  Goldenberg began making

management decisions for the Debtor with regard to personnel matters and various aspects of the

company's financial operations.

       By April 14, 2008,  Kimbro Stephens formally announced  to the Debtor's employees

that Goldenberg "has agreed to come on board as our financial partner." (Pl.'s Ex. 36.) This

announcement was made despite the fact, as alleged by Goldenberg, that he had not finalized the

letter agreement and was still conducting due diligence.

      In the course of his involvement with the Debtor, Goldenberg  addressed the Debtor's

habitual problem of overdrafts written on the payroll account.  Goldenberg stated the overdrafts were  caused, in part, by a two-day lag between the day employee paychecks were distributed on Wednesday and the subsequent wiring of NHC  funds to the Debtor on Friday. (Tr. at 106.)  He proposed that  the Debtor  open new debtor-in-possession accounts at HSBC Bank in New York, where Goldenberg and Pillar also banked,  because the payroll checks would not clear as quickly as they did at the local Regions Bank in Texarkana.  Goldenberg testified that he was not made a signatory on the new debtor-in-possession accounts. (Tr. at 18.)   Three separate  accounts were opened at HSBC: Payroll, Number 257008497; Operating, Number 257008489; and Accounts Payable, Number 257008519. (Pl.'s Ex. 33E.)

Also in his guise as consultant and potential investor, Goldenberg reviewed the Debtor's insurance policies and found carriers requiring less expensive premiums. (Tr. at 59, Pl.'s Ex. 24.)  He instigated a change of payroll companies to an entity that did not  require pre-payment. (Ex. 33 A-B) (Tr. at 61).  The assistant comptroller provided Goldenberg with  a password to access the company bookkeeping system, (Tr. at 66),   and he also received payroll reports. (Pl.'s Ex. 33-K, 33-W.) On occasion, Goldenberg  advised the accounting staff about when and if certain expenses should be paid or how they should be classified on the company books.  (See, e.g., Pl.'s Exs. 33-L, 33-N, 33-P, 33-Q, 33-S, 33-T, 33-V, 33-Y.)

Goldenberg's assistance with financial operations included transferring sums of  money from Pillar to the Debtor in April and May of 2008. (Tr. at 106.)  He described the  April and May transfers  as short-term bridge loans that were critical in maintaining a staff that otherwise "would have walked out" if their paychecks could not be cashed.   (Tr. at 102.)   When NHC "wired money, I tried to take back my short-term bridge," Goldenberg said. (Tr. at 28.)  His

5

stated purpose in extending the loans was to get the business on a sound financial footing. (Tr. at 101-102.) Pillar did not charge the Debtor interest. (Tr. at 92, 101.)  Neither did the Debtor execute promissory notes in favor of Pillar in exchange for the advances. (Tr. at 112.)

Goldenberg explained  his method for reimbursing  Pillar for the short-term loans.  When the debtor-in-possession accounts at HSBC were created, the first ten checks from the accounts payable account at HSBC were stamped with the names of the signatories, Kimbro Stephens and Jimmy Peabody, but otherwise left blank.  These checks, sequentially numbered from 1000 to 1009, remained in the possession of Raye Ann Short, the assistant comptroller.   Goldenberg stated that "whenever I wrote a check [to the Debtor], I took the check from her and . . . I put in the same amount." (Tr.  at 101.)  Goldenberg stated that when funds became available  in the accounts payable account, Goldenberg would deposit one of the pre-signed checks in Pillar's account to offset the advance  Pillar had previously extended to the Debtor. (Tr. at 101.)

The Trustee introduced copies of the ten reserved checks.  (Pl.'s Ex. 1-10.)  In reference to each exhibit, Goldenberg testified that he filled in the date, payee,  amount and memo notation handwritten on each check.  (Tr. at 29.)  He said the notations on the memo lines indicated the dates that funds were transferred  to the Debtor's account.[1]  (Tr. at 30.)  For example, Plaintiff's Exhibit 9 demonstrates that Goldenberg intended the check to reimburse Pillar for a previous $24,500.00 transfer.  He explained that,  "[i]f you look at the statements, on 5/9/08 I transferred 24.5.  I tried to match up exactly; it should be easy for accounting." [2]  (Tr. at

---

[1]Three of the reimbursement checks to Pillar do not bear any notation in the memo line.

[2]This method might have facilitated the accounting of the loans and reimbursements on the books of Pillar and the  Debtor,  but it is  impossible for the Court to match exactly the specific advances  to the Debtor with  corresponding repayments to Pillar based on this record

38. )

Of the ten checks transferring funds out of the Debtor's accounts payable account to the Defendants, six were negotiated, three were never deposited, and one was deposited but dishonored. All checks were made payable to Pillar except the dishonored check, check number 1009, which was made payable to Goldenberg. (Pl.'s Exs. 1-10.)

The checks that transferred funds from the Debtor to Pillar, funds the Trustee seeks to recover, were documented by the following exhibits:

| Exhibit | Check No. | Amount | Date | Memo |
|---------|-----------|--------|------|------|
| Ex. 1 | 1000 | $15,000 | 4/15/08 | Dep 4/9 payroll |
| Ex. 2 | 1001 | 17,000 | 4/17/08 | Dep 4/10/08 payroll |
| Ex. 3 | 1002 | 33,000 | 4/21/08 | Dep 4/10/08 A/P |
| Ex. 4 | 1003 | 15,000 | 5/13/08 | _____ |
| Ex. 5 | 1005 | 1,200 | 5/13/08 | _____ |
| Ex. 6 | 1006 | 5,000 | 5/13/08 | _____ |
| Total | | $86,200 | | |

The undeposited checks written to Pillar are represented by the following exhibits:

| Ex. 7 | 1004 | 29,000 | 4/23/08 | 4/23/08 |
|-------|------|--------|---------|---------|
| Ex. 8 | 1007 | 20,000 | 4/28/08 | Dep 4/28/08 |
| Ex. 9 | 1008 | 24,500 | 5/09/08 | 5/9/08 Tfrred from my HSBC |
| Total | | 73,500 | | |

Plaintiff's Exhibit 10, which was presented for payment but dishonored, was Check Number 1009 from the Debtor payable to Goldenberg for $15,000.00, dated April 28, 2008, and

---

because the Defendants presented no documentary evidence of Pillar's transfers to the Debtor. However, the assistant comptroller corroborated Goldenberg's testimony, and the Trustee does not refute it with regard to advances made to the Debtor.

bearing the notation "Dep. 4/28/08." Goldenberg testified that Kimbro Stephens had instructed the bank not to honor the check. (Tr. at 41.)

The Trustee introduced the Debtor's accounts payable bank statements for April 12 to May 13, 2008 (Pl's Ex. 13) and May 14 to June 12, 2008 (Pl.'s Ex. 12). Plaintiff's Exhibit 13 reflects that the day before and the day after Check 1002 to Pillar for $33,000 was presented for payment, the account showed a negative balance. Plaintiff's Exhibit 12 demonstrates that Check 1003 for $15,000, Check 1005 for $1200, and Check 1006 for $5000 were all paid to Pillar on May 14 and by May 19, the account showed a negative balance of $102,596.39. The Debtor was intermittently overdrawn throughout May. (Tr. at 43; Pl.'s Ex. 12.)

In addition to the six checks at issue, the Trustee also seeks to recover the sum of $25,000.00, which she alleges was debited by handwritten debit ticket from the Debtor's accounts payable account at HSBC on May 23 and was subsequently paid on the next business day, which was May 27, 2008. (Pl.'s Ex. 12-A, Pl.'s Ex. 38.) On the reverse side of the debiting instrument is the description "cash check," along with various other stamped numbers, the meaning of which is not explained by the record. Goldenberg agreed in testimony that the debit ticket was cleared through HSBC Bank in Brooklyn, New York, and that HSBC does not operate a branch in the state of Arkansas. (Tr. 49-50.)

Goldenberg denied authorizing the debit to the Debtor's accounts payable account. (Tr. at 43.) Later, when asked if he knew the circumstances surrounding the debit ticket, Goldenberg said, "I think this thing was transferred from my account, this 25,000 dollars, if it matches with the dates in Peabody's reconciliation." (Tr. at 45.) The Court takes this statement to mean that Pillar had previously transferred $25,000 to the Debtor and this debit was a

8

repayment to Pillar.

Plaintiff's Exhibit 34 is  Pillar Capital's HSBC bank statement, account number 237-00077-1, that documents transactions on May 23-27  and reflects a deposit of $25,000.00 into the Pillar Capital bank account on  May 27.   Initially, Goldenberg testified  that the deposit could not have been the same funds debited from the Debtor's accounts payable account because that debit would be reflected in the recipient's account on May 24, the day after May 23.  However, the Trustee adduced evidence showing that, because May 23 fell on the Friday before Memorial Day, the next business day would have been on May 27. (Pl.'s Ex. 38.).

When subsequently questioned further about a different $25,000.00 transfer from one of Pillar's accounts at HSBC Bank to Pillar's account at Chase Bank on May 23, Goldenberg responded as though he conceded the point that the $25,000 debit of the Debtor's account (Pl.'s Ex. 12-A) was deposited into Pillar's account:

Q.  Okay. So the debit ticket that is [Exhibit] 12A was deposited in the Pillar account?
A.  Pillar HSBC account.
Q.  Right. And then you issued check number 1064 based on that 25,000 dollar deposit, is that correct?
A.  I don't think that has one to do with the other, because I had other balances.

Tr. at 54-55.

From this point in the testimony, Goldenberg was not questioned further about  the $25,000 debit of the Debtor's account.  When Goldenberg's counsel later questioned him, counsel did not ask any questions about the debit, and the Defendants' post-trial brief and sur-reply do not address the issue. Under these circumstances,  the Court draws the inference that these funds, like the proceeds of the six checks listed above,  were post-petition transfers from the Debtor to Pillar, ostensibly to reimburse Pillar for advances.

Raye Ann Short, the assistant comptroller who was employed by the Debtor from March 2003 until the Debtor closed in 2008, testified about the transfers of funds between the Debtor and Goldenberg. (Tr. at 84.)   She corroborated Goldenberg's testimony that the ten blank checks were for the purpose of reimbursing  Pillar for moneys it lent to the Debtor  for payment of utilities, payroll, and operating expenses.  She stated that all the funds provided by Goldenberg defrayed the regular operating expenses of the hospital and that the checks frequently  provided cash flow until NHC's weekly cash infusion. (Tr. at 91.)

In her testimony, Short also stated  that Pillar did not charge interest,  that NHC was aware of the arrangement with the Defendants, and that she duly recorded payments to and from Pillar on the company books. (Tr. at 92-95. )   Stephens and Peabody directed her to characterize the transfers as loans and loan payments. (Tr. at 95-96.)  In Short's view, the Defendants' role was so critical that when Pillar no longer provided funding,  the hospital closed because "we couldn't cover payroll." (Tr. at  92.)

The Court takes judicial notice that the case docket reflects that operating reports, required to be filed monthly by a debtor-in-possession, were filed for the months of  March and May 2008 but not for April 2008.  The May operating report, the last such report filed prior to conversion, includes complete bank statements for the operating, accounts payable, and payroll accounts at HSBC from mid-April to mid-May. The May operating report does not specifically detail the transfers of funds between Pillar and the Debtor.

The Court also takes judicial notice that the case docket reflects that the Debtor did not file a motion to obtain credit from Pillar,  and  parties in interest did not have an  opportunity for hearing prior to the transfer of  funds from Pillar to the Debtor.

10

ARGUMENTS

The Trustee proceeds under two theories in seeking to avoid the transfer of $86,200.00 documented by Plaintiff's Exhibits 1-6, and the $25,000 debit documented by Plaintiff's Exhibit 12-A, for a total recovery of $111,200.  The Trustee argues that if the transfers to the Debtor are considered loans, they were not made in the ordinary course of the Debtor's business  and, thus, required Court approval after prior notice and opportunity for a  hearing in accordance with 11 U.S.C. § 364.   The Trustee reasons that since Court approval was never sought, the repayments to the Defendants may be avoided.

She also  argues that whatever transfers the Defendants made to the Debtor were contributions to capital, not loans,  because Goldenberg had become a *de facto* partner and investor in the Debtor.  The Trustee contends that as an investor in the Debtor, the Defendants are  not  entitled to reimbursements from the Debtor until all other claims against the Debtor are paid in accordance with the Chapter 7 distribution scheme set forth in Section  726(a)(6) of the Bankruptcy Code.

The Defendants argue that the funds advanced by Pillar were loans to defray  regular and necessary operating expenses of the hospital, and operations would have ceased without the loans. Thus, the advances were incurred in the ordinary course of business, prior notice to creditors and Court approval were  unnecessary, and the Defendants are  entitled to reimbursement for administrative expense.  Furthermore, the Defendants contend that Goldenberg was not an investor because  the evidence supports a finding that the transfers from the Defendants to the Debtor were unsecured bridge loans, not contributions to capital.

AVOIDANCE OF  POST-PETITION TRANSFERS

11

Section 549(a) of the Bankruptcy Code provides that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . that is authorized only under section 303(f) or section 542( c) of this title; or . . . that is not authorized under this title or by the court."

Post-petition transfer avoidance requires a four-part inquiry.  The Trustee must show that (1) after commencement of the bankruptcy case; (2) property of the estate; (3) was transferred; and (4) the transfer was not authorized by the bankruptcy court or otherwise allowed by some provision of the Bankruptcy Code.   Nelson v. Kingsley (In re Kingsley), 208 B.R. 918, 920 (B.A.P. 8th Cir. 1997) (citing Gibson v. United States (In re Russell), 927 F.2d 413, 417 (8th Cir. 1991); Shields v. Duggan (In re Dartco, Inc.), 197 B.R. 860, 865 (Bankr. D. Minn. 1996)). Section 549   functions "to protect the distribution priorities of the Bankruptcy Code and to promote the integrity of estate administration, by subjecting unauthorized transactions to avoidance so the assets in question are restored to the estate." In re Dartco, 197 B.R. at 865.

The evidence shows that the Debtor transferred from its bank accounts $86,200.00 by check and $25,000.00 by debit to Pillar during the pendency of the Chapter 11.  Thus, the first three elements of Section 549 are satisfied.  As to the fourth element, there is no dispute that Court approval was not obtained prior to the transfers at issue.

WHETHER COURT APPROVAL WAS UNNECESSARY UNDER SECTION 364(a)

The Defendants argue that Pillar extended unsecured credit to the Debtor and was reimbursed in the ordinary course of the Debtor's business.  Pursuant to Section 364(a), if extensions of credit are in the ordinary course of the Debtor's business, then court approval is unnecessary.  If approval is unnecessary, the fourth element of post-petition transfer avoidance

cannot be proven under this theory of the Trustee's case.

Thus, the Court must determine whether the transfers of funds at issue were made in the "ordinary course of business, " a term not defined by the Bankruptcy Code. Courts construing the term, which is contained in various bankruptcy code sections, have developed a two-pronged inquiry to determine when a debt is incurred in the ordinary course of business: a horizontal test and a vertical test. Rajala v. Langer (In re Lodge America, Inc.), 259 B.R. 728, 732 (D. Kan. 2001) (citing In re Roth American, Inc., 975 F.2d 949 (3d Cir. 1992) (applying Section 363); Fidelity Sav. & Inv. Co. v. New Hope Baptist, 880 F.2d 1172 (10th Cir. 1989) (applying Section 547); In re Poff Constr., Inc., 141 B.R. 104 (W.D.Va. 1991) (applying Section 364); In re Ill.- Cal. Express, Inc., 72 B.R. 987 (D.Colo. 1987) (applying Section 363); In re Magic Circle Energy Corp., 64 B.R. 269 (Bankr. W.D. Okla. 1986) (applying Section 364); In re Cascade Oil Co., 51 B.R. 877 (Bankr. D. Kan. 1985) (applying Section 364)); In re Blessing Indus., Inc., 263 B.R. 268 (Bankr. N.D. Iowa 2000) (citing In re Dartco, 197 B.R. at 870); Johnston v. First Street Companies (In re Waterfront Companies, Inc.), 56 B.R. 31 (Bankr. D. Minn. 1985).

The creditor asserting the ordinary-course-of-business defense has the burden of production under both inquiries. United States Trustee v. Lombardozzi (In re RJC Indus. Inc.), 369 B.R. 845, 850 (Bankr. M.D. Pa 2006) (stating the creditor has the burden to produce evidence of industry norms under the horizontal test) (citing In re Allegheny Health Educ.& Research Foundation, 127 Fed. Appx. 27 (3rd Cir. 2005)); In re Dartco, 197 B.R. at 870 (allocating the burden of production to the proponent of the ordinary course of business defense under section 364(a)) .

The horizontal test "requires the court to review an industry-wide perspective and

13

determine whether the conduct referenced is typical in the specific trade covered by the debtor's business." In re RJC Indus. Inc., 369 B.R. at 850.  The inquiry "goes to whether the transactions . . . fell within a range of accepted practices in the Debtor's particular industry." [3] In re Dartco, 197 B.R. at  870.

In the instant case, the Court seeks to determine whether it is accepted practice for a business such as this privately-owned hospital to  permit a potential investor to extend *ad hoc* bridge loans defrayed, not by a note with stated repayment terms, but by a  blank-check repayment scheme. The  Defendants failed to provide any evidence showing that  the transactions at issue  fell within a range of accepted practice in the Debtor's particular industry. Accordingly, the horizontal test has not been satisfied.

Under the  vertical test, the Court examines whether the transaction subjects other creditors to  economic risks that differ from those they expected when they  originally extended credit. In re Roth American, Inc., 975 F.2d at 953;  In re Blessing, 263 B.R. at 272 (citing Husting Land &  Dev., Inc., 255 B.R. at 778).  The test asks  "whether a reasonable creditor would view the transaction as deviating from the Debtor's day-to-day operations." In re Blessing,  263 B.R. at 272 (citing In re Waterfront, 56 B.R. at 36).

To bolster the Defendants' case, some evidence of the creditors' expectations might have been provided by  the Debtor's pre- and post-petition practice with regard to short-term financing.  See, e.g., In re Glosser Bros., Inc., 100 B.R. 268 (Bankr. W.D. Pa. 1989)

---

[3] Some courts reject the use of the horizontal test "on statutory construction grounds as applicable only to ordinary course of business defense to preference liability under section 547(c)(2)( C)," and also as redundant to the vertical test and difficult to apply. See In re Husting Land & Dev., Inc., 225 B.R. 772, 779 (Bankr. D.Utah 2000) (citing Garofolo's Finer Foods, Inc., 186 B.R. 414, 428-30 (N.D. Ill.1995), In re Lodge America, 239 B.R. at 585).

(considering, pursuant to Section 363, whether the debtor's store closings were in the ordinary course of business by reviewing the number of store closings over the previous 12-month period). Here, the evidence does not point to any past measures the Debtor ever resorted to in order to deal with its cash flow problems, other than writing bad checks and, on one occasion, persuading a creditor to hold his check for payment for services. (Tr. at 74.)

To the contrary,  the facts in evidence convince the Court that the transactions between the Defendants and the Debtor subjected other creditors to risks that differed markedly from those they would reasonably have expected.  Without Court approval and with only the knowledge of one other creditor, NHC, the Defendants transferred funds  in various amounts and structured their transactions with the Debtor so that they would be repaid by filling in pre-signed, blank checks and negotiating them as soon as  the Debtor's bank balances were sufficient  to repay the Defendants.  Through his  access to the company books  and his authority to dictate which bills to pay,  Goldenberg was able, to some degree, to manipulate the bank balances and use his  knowledge of the Debtor's finances to his advantage.  Because Goldenberg knew precisely when the Debtor's bank account held sufficient funds to repay the credit he had extended, the Defendants gained a superior position over the other unsecured creditors with accruing claims.

The Defendants have not shown that their unorthodox  method of credit extension and repayment would have been  reasonably expected by the Debtors' other creditors.  There is no proof in the record that the Debtors'  creditors, other than NHC,  expected  the Defendants' indebtedness to be  elevated to a more favorable position when compared with other accruing claims, some of which were undoubtedly  paid with overdrafts during the same period.  In fact,

15

the evidence shows that Goldenberg was represented to the Debtor's employees to be a "financial partner," not a purveyor of bridge loans to be repaid ahead of the Debtor's other creditors. Under these circumstances, the Court must conclude that creditors would have expected advance notice and an opportunity to object to the transactions between the Defendants and the Debtor.

The Defendants argue that the Debtor used funds the Defendants advanced to pay ordinary and necessary operating expenses such as utilities and payroll, and, therefore, Section 364(a) permitted their credit extensions without court approval. However, in deciding whether a transaction is in the ordinary course of business, courts distinguish between the advance of funds to the Debtor and how the advanced funds were subsequently used by the Debtor. See, e.g. In re Ockerlund Constr. Co., 308 B.R. 325, 327 (Bankr.N.D.Ill. 2004)(question was not whether proceeds of advance were used in ordinary course of business to cover administrative expenses but whether the advance itself qualified as a valid post-petition extension of credit)(citing In re Lite Coal Min. Co., 122 B.R. 692, 695-96 (Bankr. N.D.W.Va.1990); In re Massetti, 95 B.R. 360, 363 (Bankr. E.D.Pa. 1989)). Accord In re Dartco, 197 B.R. at 870 (focus of Trustee's avoidance action was not debtor's payments to its vendors but the extensions of third-party credit that funded those payments, interpreting Section 363(c)).

The Trustee does not dispute the Defendants' explanation of how the advances were used, nor does she seek to avoid the Debtor's disbursement of those funds to employees, trade creditors, and the like. Her targets are the Defendants' extensions of credit and their repayment by the Debtor. As stated above, the source and manner of the transfers appear to be anything but ordinary, and the Defendants failed to produce evidence that would prove otherwise.

16

Therefore,  Court approval was necessary prior to the Defendants' extensions of credit.

WHETHER NUNC PRO TUNC APPROVAL IS WARRANTED UNDER SECTION 364(b)

At this point in the analysis, some courts consider, pursuant to Section 105(a),  whether the extensions of credit that are ruled outside the ordinary course of business may yet be approved, for equitable considerations, on a *nunc pro tunc* basis so as to satisfy Section 364(b). [4] That Code section provides that the court, after notice and a hearing, may authorize the trustee to obtain unsecured credit other than in the ordinary course of business and the resulting debt will be allowable as an administrative expense. 11 U.S.C. § 364(b) (2006).

At the outset, extraordinary circumstances must be found to exist in order to authorize a loan on a *nunc pro tunc* basis.  In re Blessing Indus., 263 B.R. at 273 (citing In re D.C., Inc., Bankr. No. 97-01860-W, slip op. at 2 (Bankr. N.D. Iowa Dec. 19, 1997) (citing Lavender v. Wood Law Firm, 785 F.2d 247, 248 (8th Cir. 1986)(construing bankruptcy statute requiring prior court approval for professional compensation))); In re Lehigh Valley Professional Sports Clubs, Inc., 260 B.R. at 750 (citing In re City Wide Press, Inc., 102 B.R. 431, 436 (Bankr. E.D. Pa. 1989), aff'd, 110 B.R. 710 (E.D.Pa. 1990)).

 In addition to a showing of extraordinary circumstances, creditors seeking *nunc pro tunc* approval of extensions of credit must show that approval would have been granted if a timely application had been made,  that other creditors have not been harmed by the continuation of business made possible by the loans, and that the parties entered into the credit transaction in

---

[4] Other courts have declined to grant a nunc pro tunc order because "to issue an order nunc pro tunc retroactively authorizing the debtor to obtain unsecured credit, not in the ordinary course of business, and without notice and a hearing would be inconsistent with the specific provisions of section 365 of the Code."  In re Lodge America, Inc., 259 B.R. at 234.

good faith and with the honest belief that the transactions were authorized without court approval. In re Blessing Indus., 263 B.R. at 273 (citing In re American Cooler Co., 125 F.2d 496 (2d Cir. 1942)); In re Lehigh Valley Professional Sports Clubs, Inc., 260 B.R. at 750-51 (citation omitted). See also In re Husting Land & Dev., Inc., 255 B.R. 772, 783 (Bankr. D. Utah 2000) (stating court would only give retroactive approval of loan if debt would have been authorized after timely application) (citing In re American Cooler Co. , 125 F.2d at 497); In re Massetti, 95 B.R. 360 (Bankr. E.D.Pa. 1989)).

In this case, the Court cannot identify any extraordinary circumstances that would justify retroactive approval of the credit extensions. The Defendants argue that time was of the essence, implying that the Debtor's need for unsecured bridge loans was so pressing that there was no time to apply to the Court.[5] The Defendants paid NHC the $25,000.00 check on March 12, 2008, signaling the commencement of the Defendants' official involvement with the Debtor. The agreement described the payment as a "non-refundable, good faith deposit," and the Court infers its purpose was to compensate NHC for its acquiescence in the Defendants' assumption of financial control, their planned bridge loans and repayment method, and their proposed investment in the Debtor. No evidence suggests that the Stephens were similarly compensated, but it is apparent through company emails and the signing of the letter agreement by Kimbro Stephens that the Stephens initially encouraged the Defendants' participation in the company. (Pl.'s Ex. 22-B.) Thus, by March 12, 2008, the Defendants assumed some measure of control of

---

[5] The fact that the Debtor had an emergency need for funds tends to prove the Trustee's point that the loans were not in the ordinary course of business. See, e.g., In re Ockerlund Construc., 308 B.R. at 328 ("a true emergency would seem to indicate that a resort to out-of-the-ordinary-course means was necessary").

the Debtor with the knowledge and approval of the Stephens and NHC.

The evidence demonstrates that advances by Pillar to the Debtor began on April 9, 2008, which was 27 days after the Defendants paid NHC the deposit. (Pl.'s Ex. 1.) The Defendants argue that time was of the essence in providing the bridge loans, but 27 days is enough time to file a Section 364 motion, set a hearing date, provide notice to creditors, and conduct the hearing if needed. (See Fed. R. Bankr.P. 4001( c)(1),(2)).   The Court concludes that there was enough time to conform to the procedures required by law and, therefore, no extraordinary circumstances existed that would justify retroactive approval of the extensions of credit.

Furthermore, the Court's approval of the bridge loans of the type existing in this case would not have been granted even if a timely application had been made. The Court cannot condone an arrangement between the Debtor and a creditor wherein the creditor supplies funds to be repaid within days with pre-signed checks deposited at specific times based on inside knowledge of and authority over the company's financial affairs so as to ensure payment. Nor would the Court have been justified in granting such a request over other creditors' objections when to do so would automatically confer administrative expense status on the Debtor's obligations to the Defendants and reorder the priorities of existing creditors.

Similarly, the Court observes that other creditors were harmed by the continuation of business made possible by the loans. At a minimum, the Defendants' efforts violated the process due to the other creditors. See, e.g., In re Blessing, 263 B.R. at 274 ("when parties attempt to keep a company afloat while disregarding procedural safeguards, the underlying purposes of the Code [are] frustrated . . . due process requires that other interested parties have notice of the transaction.")

19

Additionally, the bridge loans and other actions of the Defendants  disguised the Debtor's bleak financial condition and encouraged the continued cooperation and participation of uninformed creditors with accruing claims.   Goldenberg himself testified that he was maintaining a staff that otherwise "would have walked out" if their paychecks were dishonored. (Tr. at 102.)  The Debtor's bank statements demonstrate that in April and May, while the Defendants were involved with the Debtor's financial operations, the Debtor's accounts payable bank balance was overdrawn despite the bridge loans and other maneuvers to shore up the Debtor.  The Defendants allowed employees and possibly other creditors in the case to believe they were already investing  in the Debtor when in reality they were merely  propping up the Debtor by moving funds back and forth between the Debtor and the Defendants.

The Debtor's employees and other creditors doing business on an ongoing basis were possibly misled as to the  Debtor's true financial condition.  In <u>Dartco</u>, a case with facts similar to those in the instant case,   the court observed that the other creditors in the case would  have wanted to know how close the Debtor was to failure and would have wanted the opportunity "to object to the very unorthodox extensions of credit and to the repayment of them at the expense of other accruing claims." <u>In re Dartco</u>, 197 B.R. at 870.

The final factor centers on  the issue of good faith and whether the Defendants honestly believed they had the authority to enter into the transactions without prior court approval. Goldenberg testified that he was unaware court approval was necessary. First, the Court must observe that  the Defendants are in the business of investing in financially distressed companies, a fact that supports a finding that the Defendants knew but  purposely ignored the proper procedures for the sake of expediency.  But even if the Court were to find that Goldenberg

20

genuinely believed he had authority to enter into the various transactions with the Debtor, the Court cannot ignore the other factors that weigh more heavily against retroactive approval.

For the reasons stated, the Court declines to grant *nunc pro tunc* approval of the Defendants' unauthorized extensions of credit. Therefore, the Trustee has proven the fourth element in the Section 549 analysis that court approval was required and not obtained. The Trustee is entitled to judgment against Pillar for the unauthorized post-petition transfers to Pillar in the amount of $111,200.00.

### WHETHER THE DEFENDANTS' TRANSFERS WERE CAPITAL CONTRIBUTIONS

The Trustee also seeks to avoid the post-petition transfers to Pillar on the basis that the Defendants' advances were capital contributions. The Court has granted judgment based on the Trustee's theory of the case that the advances were unauthorized extensions of credit, and this finding is inconsistent with a finding that the transfers were capital contributions. Therefore, the Court will not consider this argument.

### ARE THE DEFENDANTS JOINTLY AND SEVERALLY LIABLE?

The Trustee argues in her post-trial brief that the Defendants should be held jointly and severally liable for any recovery because, under Arkansas law, a corporate employee or officer may be sued individually if he is personally involved in the events that caused the damage. Further, she contends that Goldenberg's personal involvement in the repayment of the bridge loans to Pillar amounted to the tort of conversion

Goldenberg testified that Pillar was a sole-member, limited liability company with corporate papers filed pursuant to the laws of the State of New York. (Tr. at 113, 118.) Goldenberg further stated that he followed the advice of counsel with regard to operating Pillar,

21

keeping its books, and recording its minutes.  He testified that he had never mingled his funds with Pillar's by sharing a checking account or used Pillar's funds for personal expenditures. (Tr. at 117-18.)  His compensation from Pillar was an equity interest in businesses he purchased through Pillar.

When questioned by counsel for the Trustee, Goldenberg admitted that he had listed himself, rather than Pillar, as payee on one of the pre-signed checks.  (Pl.'s Ex. 10.)  He explained that this check was written to reimburse himself, individually, for charges he made to his personal credit cards to purchase items for the Debtor. (Tr. at 119.)

In accordance with New York law, the members, managers, and agents of a limited liability company are not liable for the debts, obligations or liabilities of the company solely because  they are members, managers, or agents participating in the conduct of the business of the company.  N.Y. Bus.Corp.Law § 609(a) (McKinney 2011).  A member may specifically consent to liability,  become liable by breaching a duty, or  incur  liability if  the corporate veil is pierced.  Id. at § 609(b) & § 417(a); Retropolis, Inc., v. 14th St.  Dev. LLC, 797 N.Y.S. 2d 1 (N.Y. App. Div. 2005) (citing Williams Oil Co. v. Randy Luce E-Z Mart One, 302 A.D.2d 736, 739-740 (2003)).

To pierce the corporate veil under New York law, there must be a showing that (a) the owners of the corporation exercised complete domination or control;  and (2) this domination was used to commit fraud or wrong against the plaintiff which resulted in harm. Pergament v. Precision Sounds DJ's, Inc.  (In re Oko), 395 B.R. 559, 563 (Bankr. E.D.N.Y. 2008) (citing Badian v. Elliott, 165 Fed. Appx. 886, 891 (2d Cir. 2006); American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988); Morris v. N.Y. State Dept. of Taxation & Fin.,  623 N.E.2d 1157

22

(N.Y. 1993); Millennium Constr., LLC v. Loupolover, 845 N.Y.S.2d 110 (N.Y.App. Div. 2007).

Among the factors tending to show domination and control are the absence of corporate formalities; inadequate capitalization; use of corporate funds for personal rather than corporate purpose; and the payment or guarantee of debts of the corporation by the owners or by another related corporation. Id. at 563-64 (citing Wm. Passalacqua Builders, Inc. .v Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991); William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 600-01 (2d Cir.1989); Orenbuch v. N.Shore Health Sys., 250 F.Supp.2d 145, 150-151 (E.D.N.Y.2003); In re Casale, 62 B.R. 889, 897-98 (Bankr.E.D.N.Y.1986), aff'd, 72 B.R. 22 (E.D.N.Y.1987)).

By way of testimony, Goldenberg offered evidence that all the corporate formalities were observed in his dealings with and through Pillar, and this testimony was not refuted by the Trustee. Moreover, all transfers the Trustee seeks to avoid were transfers to Pillar, not Goldenberg, and were effected with the knowledge and approval of the Stephens, who owned the company; NHC, its major creditor; and the Debtor's accounting staff.

As to the check written to Goldenberg for $15,000.00, Goldenberg explained that the money was owed directly to him individually.[6]   However, the check bears the notation "dep 4-28-20K" which indicates, consistent with the notations on other checks, that the check was a reimbursement  for funds deposited directly into the Debtor's account, not payments to third parties. (Pl.'s Ex. 10.)  If the Court accepts that all cash transfers to the Debtor were from Pillar, as the Defendants contend, then Goldenberg should not have been the recipient of a check for

---

[6] The record shows many instances where Goldenberg charged purchases to his own credit card. See, e.g., Plaintiff's Exhibits 20-C, -D,-E, and  25.

reimbursement. This fact demonstrates an attempt to use corporate funds for a personal purpose and supports a finding that Goldenberg exercised complete control and dominance. However, the domination and control must result in harm, and no harm actually came to the Debtor because the check was dishonored and the funds were never received by Goldenberg. The check to Goldenberg, without more, does not warrant a piercing of the corporate veil.

The Trustee seeks to establish Goldenberg's liability under the theory that a member of a limited liability company may be liable for his own acts or conduct if the member is personally involved in events causing injury. The Trustee emphasizes that Goldenberg had no right to withdraw $25,000.00 from the Debtor's account as a debit and that the removal of those funds constitutes the tort of conversion for which Goldenberg is personally liable.

Under New York law, a corporate officer is personally liable for a conversion of a third party's property committed in the scope of his employment. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Arcturus Builders Inc., 159 A.D.2d 283, 552 N.Y.S.2d 287 (N.Y.App.Div. 1990)(quoting Ingram v. Machel & Jr. Auto Repair, 148 A.D.2d 324, 325 (N.Y.App.Div.1989) and citing Armada Supply v. S/T Agios Nikolas, 613 F.Supp. 1459, 1471 (S.D.N.Y. 1985)).

Conversion is a common law tort action for wrongful possession or disposition of another's property. France v. Nelson, 292 Ark. 219, 221, 729 S.W.2d 161, 163 (1987). It is defined as the wrongful exercise of dominion over personal property in violation of the rights of the owner or person entitled to possession. Dent v. Wright, 322 Ark. 256, 262, 909 S.W.2d 302, 305 (1995) (citing Reed v. Hamilton, 315 Ark. 56, 864 S.W.2d 845 (1993)); Ford Motor Credit Co. v. Herring, 267 Ark. 201, 204, 589 S.W.2d 584, 586 (1979) (citing Thomas v. Westbrook, 206 Ark. 841, 177 S.W.2d 931 (1944)). Under this definition, Goldenberg must have

24

wrongfully taken control of the $25,000.00 and in so doing must have interfered with the Debtor's right of possession.

First, the evidence shows that the debited funds were deposited into the account of Pillar, not Goldenberg.  Second, the Trustee has not shown how Goldenberg effected an unauthorized debit when he was not a signatory on the Debtor's bank account. Ordinarily, when a bank debits one account and credits another, the bank does so at the direction of one with authority over the debited account.  The Court infers that Goldenberg would have needed proper authorization from those in charge of the Debtor's accounts to complete the transaction.   The record shows that those in authority, specifically Kimbro Stephens, were capable of stopping checks written to Pillar or Goldenberg if that action was deemed warranted. (Tr. at 40, Pl.'s Ex. 10.)  This circumstance demonstrates that throughout the two-month period, the Stephens continued to have the ultimate control of the Debtor's checking accounts.

Without evidence to the contrary, the Court cannot conclude that the transaction was unauthorized by the Debtor.  That being the case, the Court determines that Goldenberg did not act in a manner inconsistent with the Debtor's right to possession of the money, which it appears was transferred to repay funds previously lent to the Debtor.  Indeed, evidence in the record shows that the Debtor owed Goldenberg $73,500.00 on May 22, 2008. (Pl.'s Ex. 33-X.)  Checks totaling that amount had been written to Pillar but not cashed, and the $25,000.00 debit on May 23, 2008 could well have been a partial payment toward that indebtedness.

The Court recognizes that the loans and method of repayment were not approved by the Court.  But the fact that the transfers were unauthorized by the Court does not mean that the reimbursements interfered with the Debtor's right of possession.  For approximately two

25

months, the  Debtor and the Defendants operated under an unwritten agreement whereby credit was  extended  and reimbursement was effected from the Debtor's funds.  With the knowledge of the Debtor's principals, the Debtor's staff facilitated the transactions and accounted for them  on the company books as loans and reimbursements.

 The Court finds that none of  the reimbursements can properly be characterized as a violation of the Debtor's rights to possession for purposes of finding Goldenberg liable for conversion. Therefore,  Goldenberg is not personally liable for recovery of the Debtor's transfers to Pillar.

THE DEFENDANTS' COUNTERCLAIM FOR ADMINISTRATIVE EXPENSE

The Defendants' counterclaim seeks payment of Pillar's claim against the Debtor's estate as an administrative expense.   Pillar's proof of administrative  expense claim includes the following items: loans made directly to the Debtor for operating expenses, the value of equipment purchased by Pillar and used by the Debtor,  other funds paid to third parties on behalf of the Debtor, Goldenberg's unliquidated travel expenses, and the $25,000 fee paid by National Mutual to NHC on behalf of  Goldenberg.  (Pl.'s Exs. 20-A-N,  22-C, 35.)   The Defendants' proof of claim alleges an entitlement to a priority  administrative expense on the basis of 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1).

The Court of Appeals for the Eighth Circuit has recognized that, while  a claim for an administrative expense pursuant to section 503(b) is a core proceeding, it is not properly brought as a claim in an adversary proceeding. W.A. Lang Co. v. Anderberg-Lund Printing Co. (In re Anderberg-Lund Printing Co.),  109 F.3d 1343, 1346 (8th Cir. 1997)(citing Fed. R. Bankr.P. 7001). In  Anderberg-Lund, the court stated that "such claims are appropriately brought by

26

motion in the bankruptcy case, and relief is typically granted in contested claims only upon notice and hearing." Id. (citing Fed.R.Bankr.P. 9013, 9014; Minn.Bankr.Local Rule 1201; Colandrea v. Union Home Loan Corp. (In re Colandrea), 17 B.R. 568, 583 (Bankr. D.Md.1982) (dismissing 503(b) claim brought as a counterclaim in an adversary proceeding)).

For this reason, the Defendants' counterclaim for an administrative expense is dismissed without prejudice to pursue their claim  as a motion which may be contested by the Trustee. However, the Court has already ruled that the postpetition transfers totaling $111,200.00 were extensions of credit not in the ordinary course of business or authorized by the Court.  Therefore, pursuant to Section 364, this ruling  precludes the Defendants from seeking payment of the loans as an administrative expense under the general provisions of Section 503. See In re Massetti, 95 B.R. at 363 (declining to award administrative expense pursuant to section 503(b) when section 364 is the statute applicable to post-petition loans to the debtor) (citing as examples, In re Gloria Mfg. Corp., 47 B.R. 370 (E.D. Va. 1984); In re  London, Inc., 70 B.R. 63 (Bankr. E.D. Wisc. 1987); In re Alafia Land Dev. Corp., 40 B.R. 1 (Bankr. M.D.Fla.1984)).

THE DEFENDANTS' COUNTERCLAIM FOR TURNOVER

The Defendants also claim that Pillar purchased and lent to the Debtor certain furniture and equipment valued at $38,734.77.  This second counterclaim seeks turnover of the furniture and equipment that is alleged to be in the Debtor's possession.

The Bankruptcy Code provides for turnover of property of the estate.  The Code states that when  an entity, other than a custodian, is "in possession, custody, or control, during the case,  of property that the trustee may use, sell, or lease," that entity "shall deliver to the trustee, and account for, such property or the value of such property . . . ."  11 U.S.C. 542(a) (2006).

27

Turnover applies only to property that is acknowledged to be property of the estate.  In the instant case, the Defendants allege the opposite: that they own the equipment and furniture and that the Debtor is in possession of it.   Under these circumstances, the furniture and equipment are not the proper objects of  a claim for turnover under the Bankruptcy Code; therefore, the Defendants' second counterclaim is dismissed.

PREJUDGMENT INTEREST

The Trustee seeks an award of  prejudgment interest in compensation for  the denial of the use of the Debtor's funds that were transferred to Pillar. Where  a cause of action arises from a federal statute, federal law also governs the allowance and rate of prejudgment interest. Mansker v. TMG Life Ins.Co., 54 F.3d 1322, 1330  (8th Cir. 1995) (quoting  Depndahl v. Falstaff Brewing Corp., 653 F.2d 1208, 1218 (8th Cir. 1981)); Carpenter's Dist. Council v. Dillard Dept.Stores, Inc., 15 F.3d 1275, 1288 (5th Cir. 1994).  The award of prejudgment interest is discretionary.  Berquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1281 (8th Cir. 1988).

 Here, Section 549 of the federal Bankruptcy Code governs the Trustee's cause of action. The Code does not expressly allow prejudgment interest on a recovery under Section 549; however,  it is within the equitable jurisdiction of the bankruptcy court to allow such interest. In re Sentinel Mgmt. Grp, Inc., 398 B.R. 281, 294 n.7 (Bankr. N.D. Ill. 2008) (citations omitted).

A trustee may recover prejudgment interest at the rate set out in  28 U.S.C. § 1961(a) on an avoidable transfer in accordance with Section 549 from the earlier of the initial demand for turnover or from the date the complaint was filed..   Koonce v. McDonald (In re Koonce), 262 B.R. 850, 861 (Bankr. D. Nev. 2001);  Rieser v. Randolph County Bank (In re Masters),  137

28

B.R. 254, 262 (Bankr. S.D. Ohio 1992).  In the absence of evidence of when the trustee made demand on the defendant for recovery of unauthorized postpetition transfers, the court may regard the date of filing the complaint as the date of demand.  In re Countryside Manor, Inc., 239 B.R. 443, 446  (Bankr. D.Conn. 1999).

One bankruptcy court in the Eighth Circuit has pointed out that the rule in this circuit is that "the trustee is only entitled to prejudgment interest on a preference claim if the transferee creditor had the ability to ascertain the amount of its liability on the preference claim without judicial determination."  Peltz v. Merisel Americas, Inc. (In re Bridge Info. Sys., Inc.), 383 B.R. 139, 155 (Bankr. E.D. Mo. 2008) (citing In re Bellanca Aircraft Corp., 850 F.2d at 1281). Another bankruptcy court has ruled that prejudgment interest is recoverable  if the  elements of the action are ascertainable and the defendant lacks a worthy defense, making a recovery seem probable from the outset. Meeks v. Harrah's Tunica Corp (In re Armstrong), 231 B.R. 723, 733 (Bankr. E.D. Ark. 1999)(declining to award prejudgment interest on a preference recovery because the defense was credible), aff'd,, 260 B.R. 454 (E.D.Ark. 2001), aff'd, 291 F.3d 517 (8th Cir. 2002) . The rationale regarding entitlement to prejudgment interest in preference actions  is equally applicable to post-petition transfer actions.  In re Masters, 137 B.R. at 262.

In the instant case, the Trustee prevailed on her theory of the case that the extensions of credit were not in the ordinary course of business and, therefore, were unauthorized pursuant to Section 549.  The record does not demonstrate whether the Trustee made demand on the Defendants prior to filing the complaint.

As to whether the Trustee made demand through her complaint and amended complaints, the Court observes that none of these three pleadings alleged the theory of the case upon which

the Trustee ultimately prevailed.  The Trustee first alleged that the transfers were repayment for unauthorized extensions of credit in response to the Defendants' ordinary course of business defense argued at trial.  At the conclusion of the trial both parties moved to conform the pleadings to the evidence.  Subsequently, the parties thoroughly argued the issue in post-trial briefs.  Furthermore, the Trustee did not attempt to avoid the $25,000.00 debit transfer until the conclusion of the trial when the Trustee argued for the first time that those funds were  subject to avoidance.  (Tr. at 123.)

Because the exact amount of the recovery was not ascertainable prior to trial and also because the Defendants mounted a credible if unsuccessful defense,  the Court declines to award prejudgment interest. Under the circumstances, it would be inequitable to do so.

COSTS

The Trustee also requests the Court to award her costs incurred in this litigation.  In regard to costs, the Federal Rules of Bankruptcy Procedure provide, "The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides." Fed. R. Bankr. P. 7054.

The Rule permits the court in its sound discretion to award costs in an adversary proceeding.  Stuebben v. Gioioso (In re Gioioso), 979 F.2d 956, 962 (3d Cir. 1992); Grynberg v. Claimants (In re Grynberg), 966 F.2d 570, 576 (10th Cir.1992). The court's discretion is limited by 28 U.S.C. § 1920,  which lists the costs that are taxable by a court.

The Defendants have not argued against the payment of costs to the Trustee and have thus provided  the Court with no basis for denying costs to the prevailing party in this litigation. See First State Bank v. Fowler, 27 B.R. 1, 6 (W.D. Ark. )(affirming bankruptcy court's award of

costs since appellant offered no argument against the award).

Therefore, the Court awards the Trustee her costs of litigation in this action as provided by 28 U.S.C. § 1920. She may submit her bill of costs in accordance with Form B 263 to the clerk of the bankruptcy court.

CONCLUSION

In accordance with Section 549, the Trustee may avoid the unauthorized, post-petition transfers evidenced by Plaintiff's Exhibits 1-6. Pursuant to Section 550, judgment is granted in favor of the Trustee and against Pillar in the total amount of $111,200.00. Goldenberg is not liable for the Judgment except where the provisions of Section 550 may apply to him as an immediate or mediate transferee of the transfers.

The Court denies the request for prejudgment interest but grants the Trustee her costs pursuant to Federal Rule of Bankruptcy Procedure 7054 and 28 U.S.C. § 1920.

The Defendants' counterclaim for turnover is dismissed, and their counterclaim for administrative expense is dismissed without prejudice to pursue their claim in accordance with proper procedures set forth in the Federal Rules of Bankruptcy Procedure.

IT IS SO ORDERED.

*James G. Mixon*

Dated:   03/12/2011

JUDGE JAMES G. MIXON
U.S. BANKRUPTCY JUDGE

cc: Thomas S. Streetman, Esq.
     Renee Williams, Esq., Trustee
     Henry C. Shelton, III, Esq.

31

Jack Goldenberg